UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| FISHERPORT LLC, a Washington limited liability corporation, and JEFFREY FISHER and STACY FISHER, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>CARLYON BEACH HOMEOWNERS ASSOCIATION, a Washington nonprofit corporation, and THURSTON COUNTY, a Washington government agency,<br><br>Defendants. | Case No. 3:25-cv-05522-TMC<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

Plaintiffs Jeffrey Fisher, Stacy Fisher, and Fisherport LLC own a geoduck farm on Totten Inlet in Thurston County. They allege that Defendants Carlyon Beach Homeowners Association ("the HOA") and Thurston County have violated the Clean Water Act by discharging pollutants, specifically fecal coliform, through an outfall pipe onto their beach, contaminating the surrounding water and leading to the closure of portions of their property to shellfish farming. *See generally* Dkt. 1. Before the Court are dueling motions for summary judgment: one from Plaintiffs (Dkt. 26) against both Defendants, and one from Thurston County ("the County") (Dkt. 32). Because the County has demonstrated that its discharge of stormwater complies with

the Clean Water Act, the Court GRANTS the County's motion and the claims against the County are DISMISSED. Because the HOA has shown a genuine dispute of material fact as to the source of the fecal coliform levels, Plaintiffs' motion is DENIED, and Plaintiffs' claims against the HOA will proceed to a bench trial.

## II. BACKGROUND

### A. Factual History

In 2005 Jeffrey Fisher, a "fisheries biologist and aquaculturist by education and training," and his wife Stacy Fisher purchased 9711 Steamboat Island Road NW in Olympia, a waterfront property on the northern shore of the Totten Inlet. Dkt. 37 ¶ 8. The Fishers purchased this property with the hope of creating Fisherport, a "family-owned, sustainable shellfish farming business." *Id.* ¶ 5. Fisherport, LLC was eventually created in May 2006. *Id.* The Fishers then purchased an adjoining property in 2011, 9735 Steamboat Island Road NW, and leased the tidelands of another adjoining property, 9703 Steamboat Island Road NW. *Id.* ¶¶ 8–9. With the tidelands of these three properties, the Fishers turned "approximately four and one-half acres" into their shellfish farming business. *Id.* ¶¶ 10–11.

On January 27, 2022, Fisherport received notice from the Washington State Department of Health ("DOH") requiring the closure of approximately one and one-half acres of their farm due to elevated *E. coli* levels. *Id.* ¶ 13. The property adjacent to the Fishers' properties contains a stormwater drainage pipe operated by the County that discharges directly onto their tidelands in Puget Sound. *See* Dkt. 35 at 29; Dkt. 37 ¶ 13. The rise in *E. coli* levels was the result of the fecal coliform that emanated from the County's pipe. Dkt. 37 ¶ 13.

The County and DOH began investigating the source of the fecal matter. Dkt. 38 at 24. In an August 2022 email, an environmental health specialist for the County, wrote that the County had "confirmed the E.coli pollution to be originating from a bioswale owned by the HOA

between Steamboat Island Road and Whitecap Drive." *Id.*[1] The email explained that while "the source is not of human origin and most likely related to wildlife in the area," the County was concerned with "the condition of the bioswale," which it described as "in a state of disrepair . . . causing areas of standing water during the wet season." *Id.* The County employee further wrote that he had "instructed the HOA to repair the bioswale in accordance with the County's stormwater code including the removal of debris causing the standing water." *Id.*

That same month, the HOA's operations manager similarly wrote in an email that while the E. coli samples were "from deer scat," the County was concerned "that the drainage area is blocked with logs and overgrown with grass, etc. creating areas of standing water. By my estimate, there is a 500-yard path between the homes on both streets that needs to be made healthy again (as a bioswale) to prevent standing water." *Id.* at 74. A contemporaneous email from the Department of Health confirmed that the HOA "will be repairing the Bioswale to meet the County's stormwater code." *Id.* at 76. This effort continued into early 2023, *see id.* at 83, but it ended a few months later when the operations manager left the HOA, *id.* at 95.

In June 2023, an email from the HOA to the Department of Ecology wrote: "We have a drainage basin for runoff from private single family residences that is difficult to access, and it eroded into a bioswale in the last few years . . . there is E.coli from it contaminating a beach where shellfish farmers work in the water." *Id.* at 44. The HOA sought help from Ecology "for restoring a contaminated bioswale." *Id.* But a few months later, the HOA reversed course, taking the position that it could not complete the repairs and the responsibility lay with the individual

[1] Plaintiffs refer to this drainage feature in the subdivision as a "bioswale," while the HOA calls it a "ditch." The Court will use both terms when describing the relevant evidence and notes that the terminology does not control the material factual disputes that prevent summary judgment against the HOA.

homeowners whose parcels contained the ditch. *Id.* at 45. The County chose not to pursue an enforcement action. *Id.* at 47. In an email describing a conversation with the County in September 2023, an HOA representative wrote that a County employee had agreed that the HOA's easement did not make it legally responsible for "the ditch." Dkt. 41-2 at 3.

On November 18, 2024, Plaintiffs gave Defendants the required 60-day notice that they intended to file suit under the Clean Water Act. Dkt. 1 at 22. The lawsuit was filed on June 13, 2025, seeking statutory penalties and injunctive relief. Dkt. 1. In March 2026, Plaintiffs moved for summary judgment against both Defendants, and Thurston County moved for summary judgment seeking dismissal from the case. Dkt. 32, 36. Briefing on those motions was completed in April. The HOA has not moved for summary judgment.

**B. Regulatory History of the Clean Water Act**

Congress passed the Clean Water Act ("CWA") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA "generally prohibits" individuals, corporations, and governments from discharging pollutants into the navigable waters of the United States without a National Pollutant Discharge Elimination System (NPDES) permit. *Pac. Coast Fed. of Fishermen's Assocs., Inc. v. Nickels*, 150 F.4th 1260, 1264 (9th Cir. 2025); *see* 33 U.S.C. §§ 1311(a), 1342(a)(1).

Congress amended the CWA to regulate stormwater by enacting the Water Quality Act ("WQA") in 1987. *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 505 (9th Cir. 2013); *see also Conservation L. Found. v. Hannaford Bros. Co.*, 327 F. Supp. 2d 325, 327 (D. Vt. 2004), *aff'd sub nom. Conservation L. Found. v. Hannaford Bros.*, 139 F. App'x 338 (2d Cir. 2005). The WQA added Section 402(p), "Municipal and Industrial Stormwater Discharges," which "mandates a two-phase regulatory approach to the discharge of pollutants in stormwater." *Hannaford*, 327 F. Supp. 2d at 327. Under Phase I, NPDES permits were required for "the most

significant stormwater discharges," including large municipalities and discharges associated with industrial activity. *Ecological Rights Found.*, 713 F.3d at 505. Under Phase II, NPDES permits were similarly required for small municipal sewer systems and from small construction sites. *Id.* at 505–06; *see* 40 C.F.R. § 122.26(a)(9)(i).

The issuance of NPDES permits is delegated to the states, and in Washington State the Department of Ecology ("Ecology") is "designated as the 'state water pollution control agency for all purposes of the federal clean water act.'" *City of Tacoma v. Dep't of Ecology*, 3 Wn.3d 633, 638, 555 P.3d 390 (2024) (quoting RCW 90.48.260).

## III. LEGAL STANDARDS

Plaintiffs and the County have filed cross-motions for summary judgment, in addition to Plaintiffs' motion against the HOA. On cross-motions for summary judgment, each motion "must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). It is "well-settled in this circuit and others that the filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present." *Id*. (quoting *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the

district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

## IV. DISCUSSION

"To establish liability for an unpermitted discharge under the CWA, plaintiff must show that defendant (1) discharged (2) a pollutant (3) to navigable waters (4) from a point source (5) without permit authorization." *Bang v. Lacamas Shores Homeowners Ass'n*, 707 F. Supp. 3d 1013, 1017 (W.D. Wash. 2023) (quoting *Puget Soundkeeper All. v. Whitley Mfg. Co.*, 145 F. Supp. 3d 1054, 1055 (W.D. Wash. 2015)). The County argues primarily that the discharge from its outfall pipe is permitted because it is compliant with the regulatory system for municipal stormwater. The primary dispute between Plaintiffs and the HOA is whether the animal fecal matter that makes its way from the HOA's drainage system to the County's stormwater pipe has been impacted by human activity such that it is a "pollutant" under the CWA.

### A. The County's motion for summary judgment is granted.

Thurston County seeks summary judgment on two legal grounds: first, that it is not required to obtain an NPDES permit for its stormwater system "for the rural area at issue," and second, that "background contamination from wildlife fecal material is not regulated by the Clean Water Act." Dkt. 32 at 1. As discussed in the section of this order that addresses the HOA's liability, there are genuine issues of material fact that would prevent summary judgment on the second argument. But the County's first argument is persuasive.

It is undisputed that the County is subject to the CWA's "Phase II" regulations for smaller municipal stormwater systems. The relevant regulations require permits for municipal stormwater programs in areas with "a population of 50,000 or more." 40 C.F.R. § 122.32(a)(1). Ecology issued the County a Phase II Municipal Separate Storm Sewer System NDPES permit in 2007. Dkt. 34 ¶ 11. This permit covers much of the County, but the peninsula where Plaintiffs' property, the County's pipe, and the area at issue reside falls outside the permit's boundaries. *Id.* Because the area in question is outside the boundaries established by Ecology, the County is not required to obtain a NDPES permit for that portion of its stormwater system. *See Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 603 (2013) ("The 1987 amendments exempt from the NPDES permitting scheme most 'discharges composed entirely of stormwater,'" unless a permit is expressly required); *see also id.* at 611 (unless discharges fall within express statutory requirement, they are within "the Act's general exemption of 'discharges composed entirely of stormwater' from the NPDES permitting scheme").

Second, there is no genuine dispute of fact that the substance being discharged by the County's pipe is stormwater runoff. Both the County and Plaintiffs' experts agree that the County's pipe at issue discharges or conveys stormwater into Totten Inlet." Dkt. 39 at 6 ("a County-owned 12-inch diameter PVC outfall pipe that discharges stormwater to Totten Inlet[.]"); Dkt. 35 at 6 ("On the property immediately to the north of Fishers' properties is a drainage pipe conveying stormwater into Puget Sound."). Plaintiffs argue that these discharges still should not be considered "composed entirely of stormwater," because "[w]hen pollution is added to stormwater, the discharge is not exempt from NPDES permit requirements." Dkt. 46 at 7 (citing *Humboldt Baykeeper v. Union Pac. R. Co.*, 2008 WL 4614659, at *2 (N.D. Cal. Oct. 16, 2008)). But *Humboldt Baykeeper* is not persuasive on this point—it is a brief order that lacks meaningful engagement with the history of the stormwater permitting system. But as other district courts

have observed, stormwater by its nature "passively, predictably and inevitably picks up contaminants from the surface and from the groundwater," and Congress recognized this fact when the stormwater amendments to the CWA were enacted. *Rosemere Neighborhood Ass'n v. City of Vancouver*, No. C04-5667RBL, 2005 WL 2656995, at *4–5 (W.D. Wash. Oct. 18, 2005) (citing congressional analysis explaining that "discharges composed entirely of stormwater include pollutants that are incidental to stormwater runoff"); *see also Los Angeles Cnty. Flood Control Dist. v. Nat. Res. Def. Council*, 568 U.S. 78, 80 (2013) (stormwater "is often heavily polluted"); *Eco. Rights Found.*, 713 F.3d at 505 (stormwater "presents a unique problem under the CWA because it is a significant source of water pollution but is not inherently a nonpoint or point source") (citation modified). It is also worth noting that the Honorable Jeffrey S. White, the author of *Humboldt Baykeeper*, later reached the opposite conclusion in *Friends of Outlet Creek v. Grist Creek Aggregates, LLC*, No. 16-cv-00431-JSW, 2019 WL 1975434, at *3–5 (N.D. Cal. Mar. 19, 2019).

Because Ecology has determined that a permit is not necessary for stormwater discharged in the relevant area, the County's discharge is not a CWA violation. The Court GRANTS the County's motion for summary judgment (Dkt. 32) and DISMISSES Plaintiffs' claim against the County.

**B. Plaintiffs' motion for summary judgment is denied.**

The HOA argues that summary judgment should be denied because "genuine issues of material fact[] exist as to whether or not the fecal matter in this case is a pollutant under the CWA and the ownership of the ditch." Dkt. 40 at 1–2. The Court agrees with the HOA on the first point, and while the second is a closer question, because the Court is the trier of fact it will defer ruling on the issue until the bench trial.

First, the HOA contends that wildlife fecal matter is not a "pollutant" under the CWA when it is not the result of any transformative human activity. Dkt. 40 at 7 (citing *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1017 (9th Cir. 2002) ("*APHETI*")). In *APHETI*, the Ninth Circuit held that although the CWA defines "pollutant" to include "biological materials," the "mussel shells, mussel feces and other biological materials" generated by mussels grown on harvesting rafts were not pollutants under the act. 299 F.3d at 1009. As the court reasoned, because these materials were "natural byproducts of live mussels," not "waste material of a human or industrial process," they were not pollutants. *Id.* at 1016–17. The HOA argues that if the fecal material in its drainage ditch is simply the natural byproduct of area wildlife—a fact which it claims is genuinely disputed—it therefore cannot be considered a pollutant under the act.

Plaintiffs argue that the undisputed facts show that the heightened levels of wildlife fecal contamination in the drainage ditch *are* the result of a human process—the HOA's failure to maintain the drainage ditch as the bioswale it was intended and designed to be. *See* Dkt. 36 at 7–9. The Plaintiffs note that in *APHETI*, the Ninth Circuit recognized that "materials found naturally in the water" could still be biological pollutants in certain circumstances, such as when they are "altered by a human or industrial process" that affects "the biological composition of the water." 299 F.3d at 1017. They contend that is what has occurred here, because "[s]tagnant water in the poorly maintained Swale allows for fecal contamination that results from this concentration of wildlife activity to grow within the Swale before being discharged from the County outfall into Totten Inlet." Dkt. 36 at 9. The Plaintiffs point to this district's previous decision in *Bang v. Lacamas Shores Homeowners Assoc*., 707 F. Supp. 3d 1013 (W.D. Wash. 2023). The plaintiffs in *Bang* claimed that an HOA's failure to maintain a man-made "biofilter" had led to "the growth and decomposition of inappropriate vegetation" that generated new

pollutants into the surrounding natural wetlands. 707 F. Supp. 3d at 1016. The court concluded that even under *APHETI*, the decaying biological materials in the Biofilter were pollutants under the CWA because their growth as a lack of maintenance harmed the surrounding water. *Id.* at 1024–25.

The Court agrees that if the Plaintiffs prevail on the facts, this case is indistinguishable from *Bang*. And the Plaintiffs have pointed to plenty of evidence from which a trier of fact could find in their favor (which is likely why the HOA did not move for summary judgment). But the HOA has also put forth sufficient evidence for the trier of fact to conclude that the fecal contamination in the drainage ditch is consistent with background levels throughout the surrounding rural area. For example, the HOA points to the testimony of its expert, Jeffrey Wilson. Dkt. 42. Wilson explains that water quality tests in the surrounding peninsula showed "e. coli levels exceeding the allowable limit in eight of the nine locations where results have been obtained," including three that "do not connect to the [HOA's] stormwater drainage system." *Id.* ¶ 18. Wilson opines from these results that elevated fecal matter levels are not unique to the HOA's drainage ditch, and instead could demonstrate a "pervasive *e. coli* problem in the region related to the significant wildlife population." *Id.* The HOA also argues that during the litigation, it has maintained the ditch to address the problem of standing water, but the elevated levels of fecal coliform persist. *See* Dkt. 41-3, 41-4. Plaintiffs' expert, Owen Reese, disputes Wilson's interpretation of the test results, and contends that the samples collected from other regional stormwater pipes do not affect whether the HOA's ditch is the source of elevated fecal matter levels in Plaintiffs' properties. Dkt. 51 ¶¶ 6–13.

The Court may not weigh the credibility of competing expert testimony on summary judgment. *Coal. on Homelessness v. City & Cnty. of San Francisco*, 786 F. Supp. 3d 1264, 1297 (N.D. Cal. 2025) ("The determination of the credibility and weight of the expert's conclusions

should be reserved for the trier of fact. In such a situation, summary judgment is not appropriate.") (quoting *Yu-Santos v. Ford Motor Co.*, No. 06-CV-01773-AWI-DLB, 2009 WL 1392085, at *17 (E.D. Cal. May 14, 2009)). Whether the HOA's activity, or lack thereof, has caused elevated levels of fecal coliform in its drainage system must therefore be determined by the Court after weighing the evidence at trial, and the Plaintiffs summary judgment motion must be denied.

The HOA also argues that there are questions of fact surrounding whether it is responsible for maintain the drainage ditch because it holds only a stormwater easement, and the underlying property belongs to individual homeowners. See Dkt. 40 at 3. To support this argument, the HOA relies mainly on the notes of conversations between representatives of the HOA and the County. *See* Dkt. 41-2. The Court observes that the terms of the easements themselves, which state that the easement is "for the purpose of construction, repair, and maintenance of Storm Water Conveyance," strongly supports Plaintiffs' argument that the HOA must maintain the drainage ditch. *See, e.g.*, Dkt. 38 at 10–11*; see Crystal Ridge Homeowners Ass'n v. City of Bothell*, 182 Wn.2d 665, 672, 343 P.3d 736 (2015) (the "general rule" is that "the burden of maintaining an easement lies with the holder of that easement rather than the owner of the servient property"). But because the Court is the trier of fact for this case, it will defer ruling on this issue until after hearing all the evidence at trial.

## V. CONCLUSION

For the reasons explained above, the Court ORDERS as follows:

1. Thurston County's motion for summary judgment (Dkt. 32) is GRANTED. Plaintiffs' claims against Thurston County are DISMISSED WITH PREJUDICE.

2. Plaintiffs' motion for summary judgment (Dkt. 36) is DENIED.

3. Plaintiffs and the HOA are directed to meet and confer on a case schedule for the remainder of the litigation and shall submit a joint status report no later than

August 3, 2026. The status report should address the parties' respective positions on whether to conduct a bench trial solely on liability before discovery on remedies, or whether to complete discovery on remedies and then conduct a single bench trial. *See* Dkt. 24.

Dated this 20th day of July, 2026.

Tiffany M. Cartwright
United States District Judge